**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

IN THE MATTER OF THE SEARCH OF )
INFORMATION ASSOCIATED WITH )        UNDER SEAL
THE FACEBOOK ACCOUNT NUMBER )        No.
USER ID NUMBER 855875108 )
STORED AT PREMISED CONTROLLED )
BY FACEBOOK. )

**AFFIDAVIT OF LEE T. ROWLAND IN SUPPORT OF**
**APPLICATION FOR SEARCH WARRANT**

I, Lee T. Rowland, being first duly sworn, hereby depose and state as follows:

**A.      Introduction**

1.      I make this affidavit in support of an application for a search warrant for information

associated with the Facebook account belonging to Fiona Hogan, user identification number

855875108, email address Fiona.Hogan@yahoo.com , that is stored at premises owned,

maintained, controlled, or operated by Facebook, a social networking company headquartered at

151 University Avenue, Palo Alto, California, 94301.  The information to be searched is

described in the following paragraphs and in Attachment A and B.  This affidavit is made in

support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and

2703(c)(1)(A) to require Facebook to disclose to the government records and other information

in its possession, pertaining to the subscriber or customer operating the web sites.

2.      As set forth in this affidavit, there is probable cause to believe that the Facebook account

of sixteen year old Fiona Hogan (discussed below) contains important evidence relating to her

mother Abby Hogan's violation of 18 U.S.C. § 1001(a)(1) (Statements or Entries Generally), 18

U.S.C. § 1512(b)(3) (delayed or prevented the communication to law enforcement information

relating to the possible commission of a federal offense), and 18 U.S.C. § 1519 (knowingly

destroyed or concealed documents with the intent to impede, obstruct, or influence the investigation).

3.      The violations committed by Abby Hogan are a result of interviews and conversations with Abby Hogan surrounding the possible murder of her husband, a U.S. Foreign Service Officer, Vice Consul James Hogan.  Jurisdiction for the investigation of the possible murder of James Hogan, fall under 18 U.S.C. 7(9) (murder inside the special maritime and territorial jurisdiction of the United States); 18 U.S.C. § 1111(b) (Murder within the special maritime and territorial jurisdiction of the United States); 18 U.S.C. § 1114 (Killing an officer or employee of the United States while engaged in, or on account of, his official duties); 18 U.S.C. § 1117 (Conspiracy to Commit Murder); and/or 18, U.S.C. § 1119 (Murder of U.S. national committed overseas by U.S. national).

4.      The facts in this affidavit come from my personal knowledge of the investigation, my training and experience, and information obtained from other agents and witnesses, public record sources, and other sources as indicated herein.  This affidavit does not set forth all information known to the government about this case and is being submitted solely for the purpose of providing sufficient information to show that there is probable cause for the requested warrant.

**Agent Background**

5.      I am a Special Agent in the Bureau of Diplomatic Security (DS), U.S. Department of State and have been so employed since January 2005.  I hold a Bachelors degree in Criminal Justice from Excelsior College in Albany, New York.  Currently, I conduct criminal investigations concerning acts of violent crime committed by, and against, individuals who fall under the jurisdiction of United States Ambassadors at United States Embassies, Consulates, and Missions abroad.  I have received specialized training in the investigation of violent crime at the

Federal Law Enforcement Training Center and the Bureau of Diplomatic Security Training

Center.  I have previously served in the execution of search warrants.

### Jurisdiction for U.S. Investigation

6.      I am advised that 18 U.S.C. § 1001 makes it illegal for any person to make a false

statement to an agent "in any matter within the jurisdiction of the executive, legislative, or

judicial branch of the Government of the United States." 18 U.S.C. § 1001(a).  I am also

informed that 18 U.S.C. § 1001 applies extraterritorially to include false statements made to U.S.

law enforcement operating outside the United States.  *See United States v. Walczak*, 783 F.2d

852, 854-55 (9th Cir. 1986).  The false statements enumerated in this affidavit were all made by

Abby Hogan to U.S. law enforcement investigating the disappearance and possible murder of

James Hogan, thereby conferring jurisdiction on this Court to issue the requested warrant.

7.      This Court also has jurisdiction to issue the requested warrant because the grand jury in

the District of Columbia is investigating offenses over which the court has jurisdiction base on

the victim's nationality, his employment as a Foreign Service Officer, or the commission of the

crime, or part of the crime, within the Special Maritime and Territorial Jurisdiction of the United

States (18 U.S.C. § 7(9)(A) & (B)).  Investigators have reviewed James Hogan's cellular

telephone records, personal and government email, Facebook account, and interviewed

approximately fifty friends and business associates.  The investigation has revealed that James

Hogan's friends and business associates were primarily U.S. nationals and citizens working at

the U.S. Consulate or the U.S. Air Force forward operating base located on Curacao.

Investigators have determined that James Hogan spent the majority of his last 24 hours located

on U.S. Consulate grounds, the U.S. Air force base, or at his residence.[1]

8.     Evidence in this investigation indicates that James Hogan is dead.  If James Hogan was murdered, I believe there is probable cause that his murder would fall within the investigative and prosecutorial jurisdiction of the United States.  Therefore, this Court has jurisdiction under multiple criminal statutes.  *See* 18 U.S.C. 7(9) (murder inside the special maritime and territorial jurisdiction of the United States); 18 U.S.C. § 1111(b) (Murder within the special maritime and territorial jurisdiction of the United States); 18 U.S.C. § 1114 (Killing an officer or employee of the United States while engaged in, or on account of, his official duties); 18 U.S.C. § 1117 (Conspiracy to Commit Murder); and/or 18, U.S.C. § 1119 (Murder of U.S. national committed overseas by U.S. national).

**B.     Background: Disappearance of James Hogan**

9.     James E. Hogan, his wife Abby Hogan, and their children (sixteen year old Fiona and thirteen year old Conor) are U.S. nationals and citizens who lived in Curacao in the Netherland Antilles from August 2008 to June 2010 while James Hogan was a Foreign Service Officer assigned as the Vice Consul at the U.S. Consulate on the island of Curacao.  During the evening hours of September 24, 2009, James E. Hogan reportedly left his residence to go for a walk leaving his wife Abby Hogan, and children Fiona and Conor at home.

10.     At approximately 0830 hours, Abby Hogan called a Drug Enforcement Agency (DEA) Special Agent stationed on the island who was a friend of the Hogan family.  Abby Hogan asked for assistance in finding her husband, who she claimed had left the night before for a walk and

_____

[1]  I am also advised that with respect to offenses committed by a United States national, 18 U.S.C. § 7(9)(B) defines the term "special maritime and territorial jurisdiction of the United States to include residences in foreign States and the land appurtenant or ancillary thereto, irrespective of ownership, used for purposes of United States Government missions or entities or used by United States personnel assigned to those missions or entities.

did not return.  The DEA agent sent two fellow DEA agents to the Hogan residence to assist Abby Hogan, then reported James Hogan's disappearance to staff members at the U.S.

4

Consulate.  Later that morning, the two DEA agents escorted Abby Hogan to the local Curacao

police station (Korps Politie Curacao) where she filed a missing person report for James Hogan.

11.     The Curacao Police initiated a large scale search for James Hogan with the assistance of

the staff at the U.S. Consulate, DEA agents, and U.S. Navy and other U.S. military personnel

stationed on the island.

12.     On the afternoon of September 25, 2009, a local diver recovered a folded pair of jeans, a

pair of socks, and a pair of tennis shoes from a beach area in Curacao known as Blue Rock, and

turned in the items to the Curacao Police.  The recovered clothing matched the description

provided by Abby Hogan of what James Hogan was wearing when he left the residence on

September 24, 2009.  Bloodstains were on the jeans.  Upon visiting the location where the

clothing was discovered, Curacao Police discovered blood on the beach and on rocks in the area

near the beach shore.  Testing of the blood discovered on the jeans and the surrounding beach

area has since confirmed a DNA profile match to that of James Hogan.

13.     The Curacao police created a Task Force to investigate the disappearance of James

Hogan and requested the assistance of DS agents, and Federal Bureau of Investigation (FBI)

agents.  DS and FBI agents arrived on Curacao on the evening of September 26, 2009, and were

integrated into the Curacao Task Force.

**C.      Probable Cause of a Violation of 18 U.S.C. § 1001, 1512 and 1519 by Abby Hogan**

**Abby Hogan's False Statements to U.S. Law Enforcement Regarding Her Husband's
Disappearance**

14.     On September 26, 2009, two days after James Hogan disappeared, Curacao Police

interviewed Abby Hogan, with the assistance of two DEA Special Agents.  Agents asked Abby

Hogan if it was possible that James Hogan had a relationship with someone else, to which Abby

Hogan responded "never."  Abby Hogan was also asked if she was having a relationship with

someone else, to which she responded "no."  Abby Hogan told agents that nothing unusual

happened that evening – her husband went on his regular evening walk (albeit a little later than usual) and called her from his cell phone around 0015 hours to tell her to leave the door unlocked. She had taken a sleeping pill (a Tylenol PM) earlier in the evening and was asleep when the phone rang. She could not remember much of the conversation, but recalled James being interrupted by someone in the background. She fell back asleep after the call and slept until 0530 hours, realizing only upon awaking that James had not returned.

15.     Abby Hogan repeated this same version of events in a series of interviews with U.S. law enforcement. On October 4, 2009, Abby Hogan was interviewed by DS Special Agent (SA) Bashnan. During the course of the interview, DS SA Bashnan asked Abby Hogan if there had been any changes during the last year that would have affected James Hogan. Abby Hogan stated that there had been no changes. DS SA Bashnan also asked Abby Hogan if there was anything different about her husband's job, health, or family. Abby Hogan provided several examples of changes to his job and health, but did not provide any indication that she was having any relationship problems with James Hogan. Abby Hogan stated that James Hogan was not having any mood swings and was not having trouble sleeping.

16.     On March 18-19, 2010, DS SA Bashnan again interviewed Abby Hogan, who again denied any affair, denied there had been a fight or anything unusual the evening her husband disappeared, reiterated that she had slept through the night and could not remember anything from the last telephone conversation except that he asked her to leave the door unlocked and that he was interrupted by someone nearby.

17.     Evidence obtained in this investigation contradicts Abby Hogan's statements regarding the events leading up to her husband's disappearance, including: (1) whether Abby Hogan was having an affair and wanted to leave her husband for her lover; (2) whether James Hogan discovered the renewed relationship and fought with his wife before he disappeared; (3) Abby

6

Hogan's activities after her husband telephone her; and (4) whether she owned and had access to a pink laptop computer.

### Abby Hogan's Affair with Mike Ward

18.    DS executed search warrants for Abby Hogan's Facebook account and her YAHOO! e-mail account.  The DS Computer Investigations and Forensics (CIF) laboratory examined Abby Hogan's account information. The searches uncovered a series of e-mails between Abby Hogan and a Mike Ward.  These e-mails detail -- contrary to Abby Hogan's statements -- that she was having an affair with Mike Ward, her high school boyfriend living in Florida:

• On March 22, 2009, Abby Hogan wrote to a high school classmate named Sean that she had been thinking of reconnecting with Ward.  She obtained Ward's contact information from that classmate, and her Skype records establish that she placed multiple phone calls to Mike Ward.

• In August 2009, Abby Hogan wrote an e-mail discussing her planned visit to Florida, stating that "I think I (sic) past being excited, meaning I have calmed down and now just want it to happen."

• August 16, 2009, the day she left for Florida to meet Ward, Abby Hogan wrote to a friend that "It struck me sometime this year that * * * I'm stuck with Jim FOR THE REST OF MY LIFE."

• On September 1, 2009, four days after she returned to Curacao, Abby Hogan e-mailed her sister asking "[w]hat do you recommend as a career move for me if I were to go to FL and attempt to practice law?"

• On September 2, 2009, Abby Hogan e-mailed her friend Shenae (Last Name Withheld), to set up a call because Abby Hogan needed to talk.  Abby Hogan's Skype records confirm a 17 minute, 26 second call with Shenae on September 3, 2009.  In an e-mail to Ward on September

9, 2009, Abby Hogan references that conversation when she states that her friend Shenae is "very concerned that you have to leave your wife b4 I commit to this."

> • In a Facebook exchange around the same time, Abby Hogan sends Ward a Facebook e-mail.  In the message she explains to Ward that Facebook email messages are private, verses the Facebook message wall which can be seen by everyone, then writes, "meaning I can write all kinds of filthy things here if I want.  I'll just stick to telling you I love you and letting you imagine the filthy parts."

> • On September 21, 2009, Abby Hogan e-mailed herself photos from her trip to Florida, including photos of a rumpled bed in her hotel room.

19.    DS CIF identified emails between James Hogan and Abby Hogan discussing her upcoming trip during the last two weeks of August 2009 to visit her family in Pensacola Florida. DS agents conducted Treasury Enforcement Communications System (TECS) inquires on the travel history for Abby Hogan and determined she had used her U.S. Diplomatic Passport number 900XXXXXX to enter the United States in Miami on August 16, 2009, and used the same U.S. Diplomatic Passport to return to Curacao on August 28, 2009.

**James Hogan Discovers Evidence of the Relationship**

20.    Based on the evidence obtained in this investigation, I believe that, on or around September 20, 2009, James Hogan discovered that his wife had a renewed relationship with her former boyfriend and that James Hogan became increasingly suspicious of his wife.  DS CIF examined the contents of the hard drive taken from the government owned computer located in James Hogan's office at the U.S. Consulate in Curacao.  DS CIF recovered a fragment of what appeared to be a September 22, 2009, email written by James Hogan to his wife Abby Hogan.

Analysts have reviewed all email and saved files related to James Hogan, and cannot find a

record of the September 22, 2009, email being sent or saved.  DS CIF Analysts have reported

that this indicates that after writing the email, James Hogan may have deleted the email before

sending it.

21.     DS CIF analysts provided DS agents with a copy of the email fragment recovered from

James Hogan's hard drive.  The author wrote the email to "Abby," and signed the email "Jim."

"Jim" wrote the following message to Abby:

> I had a hard time sleeping * * * Sunday night because I was thinking of the best way to
>
> talk with you plus I spent a lot of time looking at articles about how couples should
>
> handle relationships with the opposite sex. * * * I've never worried about Mike – maybe
>
> I should but I've always thought you were out of his league. * * * Monday – I thought I
>
> was in for a somewhat uncomfortable conversation but that you'd probably agree that
>
> you should have told me[.] * * * I wasn't trying to trick you.  I was dropping as many
>
> hints as possible so you could tell me and I wouln't have to ask why did you conceal [it]
>
> from me.  I was very surprised when you lied to me.

Jim further described how he had cried the night before and that day in his office with the door

closed, and concluded that the only person he had ever trusted was her, adding that "I want to go

back to doing that as soon as you tell me I can."

22.     DS agents obtained a search warrant for James Hogan's Facebook account.  DS CIF

analyzed the data provided by Facebook for James Hogan's account.  Analysts discovered that

the day James Hogan disappeared on September 24, 2009, he signed onto his Facebook account

before accessing the Facebook account of his wife Abby Hogan then her list of Facebook friends.

After viewing Abby Hogan's friend list, James Hogan accessed the Facebook account of Michael

J. Ward.  Michael J. Ward was listed on Abby Hogan's friend list.  Analysts further determined that there was no record of James Hogan doing this before September 24, 2009.

**Abby and James Hogan Fight**

23.     Based on these e-mails, I believe -- contrary to Abby Hogan's statements -- that James Hogan was under considerable stress in the days leading up to his disappearance.

        • In an e-mail on September 22, 2009, two days before he disappeared, James Hogan sent Abby Hogan an email, writing: "There's been a lot of times lately where I've really felt lousy and you asked me to do things and I either said no or didn't show much enthusiasm."  Abby Hogan sent an email response later in the day on September 22, 2009 in which she stated; "I'm sorry I've made you worry. You really don't have to."

        • In this same e-mail James also wrote: "I haven't gotten nearly enough sleep for three nights running."

        • On September 23, 2009 (the day before he disappeared), James Hogan sent Abby Hogan an email labeled "work, work, work."  After complaining to her about his job and listing everything he had done that morning, James Hogan wrote; "When I'm not feeling well it is all that I can handle and I feel trapped having to earn a paycheck."

24.     Based on the evidence in this investigation, I believe that -- contrary to Abby Hogan's statements -- James and Abby Hogan had a fight shortly before he disappeared over her relationship with Mike Ward.

        • On November 4, 2009, Abby Hogan sent Mike Ward an e-mail titled "i love you."  In that e-mail, Abby Hogan stated that, on the evening her husband disappeared, James Hogan "saw that I had a folder full of emails with you.  He was pretty upset with me for not telling him. *** He went out for a walk later than he usually did and I didn't pay any attention, and the next think I knew I was trying to find him the next morning."

• On March 18, 2010, FBI agents interviewed Mike Ward in Florida.  Ward admitted that Abby Hogan had renewed contact with him and that they had met in Florida in August 2009, at which time they immediately commenced a sexual relationship.  Mike Ward stated that, after their first encounter, Abby Hogan began emailing him and calling him on Skype regularly.  During their conversations, Abby Hogan mentioned she was unhappy with James Hogan, but did not want her children to go through a divorce process.  Mike Ward indicated that after James Hogan disappeared, Abby Hogan continued to contact him.  Mike Ward stated Abby had confided to him that her husband found out she was communicating him, and on the night her husband disappeared, they had argued.  According to Abby Hogan, James Hogan had become angry when Abby refused to stop communicating with Mike Ward and left the house.

• On June 12, 2010, DS and FBI agents executed a search warrant at Atlanta Hartsfield International Airport as the Hogan family returned to the United States and seized, *inter alia* a Compaq laptop computer, serial number EZ429VA#ABA which was in a bag carried by Fiona Hogan, Abby Hogan's daughter.  A DS CIF Analyst analyzed that computer and discovered that it contained the user profile of Fiona Hogan and discovered a fragment from a message Fiona sent to her former boyfriend on Facebook on May 2, 2010.  The DS CIF Analyst provided the text of that fragment to me.  In that fragment, Fiona wrote:

> "i remember the night my dad left. and they were fighting. i imagine it over and over, him sick and sad and annoyed by her never letting him into her head and he leaves the house. maybe then he comitted suicide in barbara beach, maybe he was kidnapcalled and then got kidnapped and killed...whatever happened...it happened because my mother hurt him."

**Abby Hogan is Awake, on Her Computer, and Aware that James Hogan Has Not Returned**

25.     During a series of interviews with U.S. law enforcement over several months after her husband disappeared, Abby Hogan recounted the same story.  She told agents that nothing unusual happened that evening – her husband went on his regular evening walk (albeit a little later than usual) and called her from his cell phone around 0015 hours to tell her to leave the door unlocked.  She had taken a sleeping pill (a Tylenol PM) earlier in the evening and was asleep when the phone rang.  She fell back asleep after the call and slept until 0530 hours, realizing only upon awaking that James had not returned.

26.     DS CIF reviewed James Hogan's cell phone account and for September 24, 2009 which record a phone call beginning at 0010 hours and lasting 2:58 minutes to Abby Hogan's cell phone.  DS CIF analyzed Abby Hogan's YAHOO! account and compared the account data with James Hogan's phone records.  Abby Hogan's YAHOO! account data indicated the account had been accessed approximately one minute after the cellular phone call ended at 0014 hours, then the account was accessed again at 0135 hours, 0308 hours, and again at 0332 hours.

27.     Investigators reviewed the analysis of Abby Hogan's Facebook account and discovered it was accessed approximately one minute after the last YAHOO! account access time at 0333 hours.  Abby Hogan's YAHOO! and Facebook accounts were accessed from an IP address which was determined to be the Hogan residence in Curacao.  Based on this evidence, I believe that -- contrary to her statements to law enforcement agents -- Abby Hogan did not fall back asleep after her husband phoned her at 0010 hours and did not first discover his absence until she awoke at 0530 or 0600 hours that morning.

### Abby Hogan's Pink Laptop Computer

28.     DS CIF conducted further analysis of Abby Hogan's YAHOO! account and discovered an email dated January 3, 2009 to James Hogan.  The email was signed "Abby Hogan", and the content of the email ended with the phrase; "…this pink computer is nice!"

29.     Investigators reviewed information provided to them by DS SA Grimes who had

observed the search of the Hogan residence by Curacao Police on September 26, 2009 when they

executed a search warrant on the residence.  The search targeted anything belonging to James

Hogan or used by James Hogan which could provide clues to where he might be.  The Magistrate

Judge who issued the search warrant accompanied the police to the residence.  During the search,

police observed the Hogan children, sixteen year old Fiona and thirteen year old Conor, were

using a pink laptop computer to watch a movie.  The police indicated to the Judge that they

would like to seize the pink laptop computer for analysis.  The Judge advised Abby Hogan that

the police would like to take the computer.  Abby Hogan responded that the pink laptop was

Fiona's computer and indicated that she (Abby Hogan) never used it.  The Judge ruled that since

the laptop was Fiona's laptop and not used by James or Abby Hogan it would not be seized.  DS

SA Grimes advised investigators that approximately thirty minutes later, he observed Conor

bring the laptop to Abby Hogan because the screen saver had activated.  DS SA Grimes observed

Abby Hogan type a password into the computer before returning the computer to her son.

30.     DS SA Bashnan and Curacao Police investigator Zwinkels questioned Abby Hogan on

March 19, 2010.  During the interview, Abby Hogan continued to deny being awake the night

her husband disappeared, and repeatedly denied having an affair with Mike Ward.  Abby Hogan

was asked if she owned a pink laptop computer.  Initially she stated the pink laptop computer

was not hers and that her computer was gray.  Investigators recalled the January 3, 2009 email in

which Abby wrote "…this pink computer is nice!"  Abby Hogan responded that she no longer

possessed the pink laptop because it had broken and "they" were unable to fix it.  Abby Hogan

stated the laptop was in the trash in Florida.  Investigators suggested that she had disposed of the

laptop because she was frightened of the police investigation and about what the police could

find on it.  Investigators asked Abby Hogan when she disposed of it, and she responded that she had thrown it out in August 2009 prior to James Hogan's disappearance.

31.     Investigators searched James Hogan's financial records and discovered a credit card statement indicating he made a purchase from Dell for $994.00 in December 2008.  Dell identified a purchase made by James Hogan on December 17, 2008 for $994.00.  The purchase was for a Dell XPS M1530 "promise pink" laptop computer, tag number BN4ZTH1.  Dell advised that James Hogan had purchased a warranty for the computer which was good through December 17, 2010 that covered the computer and its software.  The warranty provided that in response to any warranty claim, Dell would send a computer technician to the location of the broken computer and fix the computer on site.  Dell also checked their records and found no record that the laptop computer purchased by James Hogan had been serviced.

32.     Investigators learned that Abby Hogan was scheduled to move from Curacao to the United States in June 2010.  A search warrant from the Southern District of Florida was obtained to search the contents of Abby Hogan's shipment of household goods when the shipment entered the United States from Curacao.  On June 15, 2010 FBI agents executed the search warrant on Abby Hogan's household goods shipment and discovered it contained a Dell XPS M1530 "promise pink" laptop computer, tag number BN4ZTH1, the same make, model, and tag number as the laptop computer purchased by James Hogan on December 17, 2008.  The computer was logged into evidence and is being analyzed by DS CIF.  Initial analysis has revealed that the pink laptop computer has a profile for Abby Hogan but does not contain a profile for Fiona Hogan.  Based on this evidence, I believe that -- contrary to her statements to law enforcement agents – the pink laptop was Abby Hogan's laptop computer and did not belong to another family member; the laptop did not break and Abby Hogan did not try to get it fixed; Abby Hogan did

not dispose of the pink laptop in Florida in August 2009; and Abby Hogan still possessed the pink laptop computer on March 19, 2010 when she told agents she did not.

### Abby Hogan's Efforts to Obstruct the Investigation

33.     In analyzing the data provided by YAHOO! DS CIF examined and discovered an email sent several weeks after James Hogan disappeared on October10, 2009 to a friend of Abby Hogan's (hereafter SOURCE).  The email referred to SOURCE by her first name, then stated; "if an investigator talks to you please don't tell him what i talked to you about.  Abby Hogan…"

34.     DS SA Murray-Rosanoff and Curacao police investigator Hogenboom interviewed SOURCE on March 18, 2010 at her home.  SOURCE stated that Abby Hogan told her during an August 2009 conversation that she was in love with a man named Mike Ward and she was no longer in love with her husband.  SOURCE stated that in a September 2009 conversation with Abby Hogan which occurred prior to James Hogan's disappearance, Abby Hogan had said she was unhappy with her marriage.  SOURCE stated she had the distinct impression Abby Hogan wanted to leave James Hogan and her children.  SOURCE confirmed she had received an email from Abby Hogan shortly after James Hogan's disappearance asking her to not speak to investigators.

35.     Pursuant to the June 12, 2010 search warrant executed at Hartsfield International Airport, DS and FBI agents seized multiple cell phones from the personal and checked baggage of Abby Hogan.  DS CIF analyzed the cell phone registered to Abby Hogan in Curacao and concluded that it was the cell phone called by James Hogan's cell phone on the night of his disappearance. CIF analysis revealed that the record of the incoming 2:58 minute call at 0010 hours from James Hogan had been deleted from Abby Hogan's cell phone.  The cell phone contained no text messages from September 24, 2009 (the day James Hogan disappeared), even though records

from Dutch law enforcement demonstrate that James Hogan sent at least one text message to Abby Hogan on that day.

**Probable Cause Conclusion: Abby Hogan violated 18 U.S.C. §§ 1001, 1512(b)(3), and 1519**

36.     I believe that there is probable cause to believe that Abby Hogan was having a serious relationship with Michael J. Ward, and that James Hogan was aware of that relationship.  I believe Abby knew that James Hogan was troubled in the weeks leading up to his disappearance.  I believe Abby Hogan made false statements about these facts to U.S. federal agents which is a violation of 18 U.S.C. § 1001 (a)(1).

37.     Further, I believe that there is probable cause to believe that Abby Hogan took steps to conceal her pink laptop computer from U.S. federal agents, delete records of phone calls and text messages from her cellular phone from September 24, 2009, and send an email to her friend to not speak to investigators should she be interviewed, which are violations of 18 U.S.C. § 1512 (b)(3), (delayed or prevented the communication to law enforcement information relating to the possible commission of a federal offense), and 18 U.S.C. § 1519 (knowingly destroyed or concealed documents with the intent to impede, obstruct, or influence the investigation).

**D.     Probable Cause That Fiona Hogan's Facebook Account Possesses Evidence That Abby Hogan Violated 18 U.S.C. §§  1001, 1215(b)(3), and 1519.**

38.     Curacao Police investigators interviewed Abby Hogan, sixteen year old Fiona Hogan, and thirteen year old Conor Hogan separately on September 25, 2009 several hours after Abby Hogan submitted a missing person report with the police.  When the police investigators interviewed Fiona Hogan, she stated that her parents returned from a party at approximately 9:00 p.m. on September 24, 2009.  Fiona Hogan stated that when her parents returned home she was asleep.  Fiona Hogan stated that when she awoke the following morning her mother stated that her father was in bed and did not feel well.

39.     On June 12, 2010, DS and FBI agents executed a search warrant at Atlanta Hartsfield International Airport as the Hogan family returned to the United States and seized, *inter alia* a Compaq laptop computer, serial number EZ429VA#ABA which was in a bag carried by Fiona Hogan.  A DS CIF Analyst analyzed that computer and discovered that it contained a single password protected profile belonging to Fiona Hogan.  Further analysis of the computer detail -- contrary to Fiona Hogan's statements to the Curacao Police -- that she was awake when her parents returned home on the evening of September 24, 2009; she overheard her parents argue; the argument was severe enough that she blames her mother for the disappearance and possible death of her father; and she discusses her frustrations and concerns with her friends, using her laptop computer to communicate:

• Between 1813 and 2141 hours on September 24, 2009, there were numerous instances of activity on the computer.  More specifically, there were five separate entries into iTunes audio playback program indicating activity on the iTune account between 2105 and 2141 hours, which indicate that the user of the computer was awake during that time.

• In one message fragment recovered from the computer, analysts discovered a message Fiona sent to her former boyfriend on Facebook on May 2, 2010.  The DS CIF Analyst provided the text of that fragment to me.  In that fragment, Fiona wrote:

> "i remember the night my dad left. and they were fighting. i imagine it over and over, him sick and sad and annoyed by her never letting him into her head and he leaves the house. maybe then he comitted suicide in barbara beach, maybe he was kidnapcalled and then got kidnapped and killed...whatever happened...it happened because my mother hurt him."

• In an online chat message fragment recovered from the computer, analysts discovered a message Fiona wrote  "…and I wish I could have a family but im the only one in this fucking family who really knew my dad better than any of them".

• In another online chat message fragment recovered from the computer, Fiona wrote "I don't mind YOU asking =] it sucks..a lot..and I don't stop missing him."

40.    Investigators reviewed the investigative files and determined that Fiona Hogan's bedroom was located adjacent to the master bedroom in the Hogan household.  Investigators believed this to be significant because Fiona Hogan's proximity to the master bedroom would allow her to overhear any arguments between Abby and James Hogan which occurred in the master bedroom.   According to Abby Hogan's statement, she spent time with James Hogan in their bedroom on the evening of September 24, 2009 after returning home from the party.

41.    I believe that Fiona Hogan was awake when her parents returned home on the evening of September 24, 2009, and during the final hours before James Hogan disappeared. Further, I believe Fiona Hogan witnessed a severe argument between her parent and she has discussed the details of what she witnessed with her friends using Facebook. DIS CIF analysis of Fiona Hogan's computer has revealed she regularly uses her Facebook account.  Further, DS CIF has recovered the fragment of a Facebook message and from the computer sent by Fiona to her former boyfriend on May 2, 2010.  In the Facebook message Fiona discusses the events of the night of September 24, 2009.  I believe that Facebook messages between Fiona and her former boyfriend may contain additional details about what Fiona witnessed on September 24, 2009, and those details will provide investigators additional information as to what happened to James Hogan on September 24, 2009, and additional evidence that Abby Hogan has lied to investigators about what happened on September 24, 2009.

**Probable Cause Conclusion**

42.     DS record checks do not reveal any travel by James Hogan on either U.S. tourist issued or U.S. diplomatic passport booklets.  As of July 22, 2010 James Hogan has not been found.  The evidence collected to date strongly suggests that James Hogan is now dead.  The investigation is still considering all possibilities including kidnapping, murder, and suicide.

43.     I believe that there is probable cause to believe that Abby Hogan was having a serious relationship with Michael J. Ward, and that James Hogan was aware of that relationship.  I believe Abby knew that James Hogan was troubled in the days leading up to his disappearance.  I believe Abby Hogan concealed evidence and made false statements to U.S. federal agents about her relationship with her husband, Michael Ward, and James Hogan's state of mind, which is a violation of 18 U.S.C. § 1001(a)(1), 18 U.S.C. § 1512(b)(3), and 18 U.S.C. § 1519.

44.     I also believe that Fiona Hogan overheard her parents arguing on the evening of September 24, 2009, and the content of that argument was serious enough for Fiona Hogan to blame her mother for the disappearance and possible death of her father.  I believe that Fiona Hogan has turned to her friends to discuss the events of the evening of September 24, 2009.  I believe Fiona Hogan's Facebook account will contain statements to her friends that will shed light on what happened to James Hogan and what Abby Hogan has concealed from investigators, which are violations of 18 U.S.C. § 1001(a)(1), 18 U.S.C. § 1512(b)(3), and 18 U.S.C. § 1519.

**E.      Technical Background**

45.     Based on my training, experience, and knowledge, I know the following:

        a.      The Internet is a worldwide network of computer systems operated by governmental entities, corporations, and universities.  In order to access the Internet, an individual computer user must subscribe to an access provider, which operates a host computer system with direct access to the Internet.  The World Wide Web is a functionality of the Internet which allows users of the Internet to share information;

      b.      With a computer connected to the Internet, an individual computer user can make electronic contact with millions of computers around the world.  This connection can be made by any number of means, including modem, local area network, wireless, and numerous other methods; and

      c.      E-mail is a popular form of transmitting messages and/or files in an electronic environment between computer users.  When an individual computer user sends e-mail, it is initiated at the user's computer, transmitted to the mail server of the subscriber's access provider, then transmitted to its final destination.  A server is a computer that is attached to a dedicated network and serves many users.  An e-mail server may allow users to post and read messages and to communicate via electronic means.

46.     Based on my knowledge and experience, individuals use e-mail accounts to write, send, and receive, among other things, personal correspondence to family members and friends regarding their whereabouts, daily plan, people they meet, and significant events—both positive and negative, and to conduct business with business associates.  Individuals may also receive e-mail messages regarding financial transactions such as withdrawals and payments.  Based on my knowledge and experience investigating missing person cases, missing persons may write or receive e-mail messages which reveal, among other things, their last known activities and whereabouts and also reveal information regarding possible suspects and witnesses, information that contradicts statements by possible suspects and witnesses, and a motive for the murder.  Based also on my knowledge and experience, criminals may attempt to access the e-mail accounts of their victims in order to destroy or manipulate evidence.

**F.**     **Facebook Social Networking Website**

47.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish

accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

48.    Facebook asks users to provide basic contact information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook users can also:

a.    Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, to all Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

b.    Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

c.    Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items

available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

d.      Facebook has a Photos application, where users can upload an unlimited number of albums and photos.  Another feature of the Photos application is the ability to "tag" (*i.e.*, label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, a user's "Photoprint" includes all photos uploaded by that user that have not been deleted, as well as all photos uploaded by any user that have that user tagged in them.

e.      Facebook users can exchange private messages on Facebook with other users.  These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

f.      Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

g.      The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page.  Gifts cost money to purchase, and a personalized message can be attached to each gift.

22

h.      Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.  Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

49.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

50.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: friend lists; groups and networks of which the user is a member; "News Feed" information; "Wall" postings; "Notes"; status updates; links to videos, photographs, articles, and other items; event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

51.     Facebook also retains IP logs for a given user ID or IP address.  These logs contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

52.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service

23

(including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their account, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

53.     Therefore, the computers of Facebook are likely to contain all the material just described, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and account application.

54.     Based on my knowledge and experience, individuals use Facebook accounts to write, send, and receive, among other things, personal correspondence to family members and friends regarding their whereabouts, daily plan, people they meet, and significant events—both positive and negative, and to conduct business with business associates.  Based on my knowledge and experience investigating missing person cases, missing persons may write or receive messages which reveal, among other things, their last known activities and whereabouts and also reveal information regarding possible suspects and witnesses, information that contradicts statements by possible suspects and witnesses, and motives for crimes committed against them.  Based also on my knowledge and experience, criminals may attempt to access the online accounts of their victims in order to destroy or manipulate evidence.

**G.     Information to be Searched and Items to be Seized**

55.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to

require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

**H.      Conclusion**

56.      Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that on the computer systems in the control of Facebook there exists evidence of a violation of 18 U.S.C. § 1001(a)(1) (Statements or Entries Generally), 18 U.S.C. § 1512(b)(3) (delayed or prevented the communication to law enforcement information relating to the possible commission of a federal offense), and 18 U.S.C. § 1519 (knowingly destroyed or concealed documents with the intent to impede, obstruct, or influence the investigation). Accordingly, a search warrant is requested.

57.      This Court has jurisdiction to issue the requested warrant because the grand jury is investigating offenses over which the court has jurisdiction pursuant to 18 U.S.C. 7(9) (murder inside the special maritime and territorial jurisdiction of the United States); 18 U.S.C. § 1111(b) (Murder within the special maritime and territorial jurisdiction of the United States); 18 U.S.C. § 1114 (Killing an officer or employee of the United States while engaged in, or on account of, his official duties); 18 U.S.C. § 1117 (Conspiracy to Commit Murder); and/or 18, U.S.C. § 1119 (Murder of U.S. national committed overseas by U.S. national).  See 18 U.S.C. § 2703(a).

58.      Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.


**I.      Request for Sealing**

59.     It is respectfully requested that this Court issue an order sealing, until further order of the

Court, all papers submitted in support of this application, including the application and search

warrant.

60.     I believe that sealing this document is necessary because the items and information to be

seized are relevant to an ongoing investigation into criminal activity involving the disappearance

of Foreign Service Officer James E. Hogan.  Premature disclosure of the contents of this

affidavit could alert the criminals who have been involved with James Hogan's disappearance

and compromise the government's on-going investigation severely.  Based on my training and

experience, I have learned that criminals actively search for criminal affidavits and search

warrants via the internet, and disseminate them to other criminals as they deem appropriate.

Premature disclosure of the contents of this affidavit and related documents may have a

significant and negative impact on the continuing investigation and may severely jeopardize its

effectiveness.


_____

Lee T. Rowland
Special Agent
Diplomatic Security Service
U.S. Department of State


Sworn to and subscribed before me
on this \_\_\_\_\_ day of August 2010


_____

Hon. Alan Kay
United States Magistrate Judge
District of Columbia